UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ELIDIA DUARTE,

    Plaintiff,

    v.

CLAYTON BEGRIN et al.,

    Defendants.

No. C 05-05223 MHP

**MEMORANDUM & ORDER**
**Re: Defendants' Motions for Summary Judgment**

    Plaintiff Elidia Duarte brought this action against individual defendants Clayton Begrin, Timothy Harrison, Michelle Petrillo and Eve Provost, as well as the City of Petaluma, Napa State Hospital and Petaluma Ecumenical Properties, alleging eighteen causes of action, including causes of action pursuant to 42 U.S.C. section 1983 ("Section 1983"). Plaintiff's claims against Provost and Petaluma Ecumenical Properties have been dismissed with prejudice. The remaining defendants now move for summary judgment as to plaintiff's Section 1983 claims. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court hereby enters the following memorandum and order.

BACKGROUND

    This action arises from an incident on March 16, 2004 which resulted in plaintiff Elidia Duarte being taken from her home by two police officers and transported to Napa State Hospital, where she underwent a psychological evaluation before being released that evening.

Plaintiff is a senior citizen living in Petaluma. Duarte Dec. ¶ 21. She speaks only Spanish and understands very limited English. Id. ¶ 21. She is approximately 5'2", weights 140 pounds, and is physically disabled in that she does not have the full use of her hands and knees. Id. ¶ 22.

Defendants Clayton Begrin and Timothy Harrison are officers with the Petaluma Police Department. Defendant Michelle Petrillo is a registered nurse, and on March 16, 2004 was employed as the Nurse Resource Coordinator at Napa State Hospital. Petrillo Dec. ¶¶ 1–2.

On the morning of March 16, 2004, plaintiff telephoned Napa State Hospital and left a voicemail stating that she wanted schedule an appointment with a Spanish-speaking therapist. Duarte Dec. ¶ 1; First Amended Complaint ("FAC"), Exh. 1. Plaintiff claims that someone she believes to be Petrillo, but whom she could not understand at the time, called back and hung up. Duarte Dec. ¶ 2. Several hours later, Petrillo called plaintiff. Id. ¶ 3. The facts surrounding this phone conversation are in dispute. According to plaintiff, plaintiff "asked her why she had yelled at [her] and hung up. In a loud voice, Petrillo demanded, 'Speak English! What's your problem?'" Id. Plaintiff then started to cry and asked to speak to a Spanish-speaker. Id. A Spanish-speaking woman came on the line and began talking to plaintiff, at which point plaintiff's doorbell rang. Id. ¶ 3–4. At the door were plaintiff's building manager and Officers Begrin and Harrison. Id. ¶ 4. Plaintiff claims that the officers "unsnapped their gun-straps and forced their way in." Id. ¶ 5. Plaintiff returned to the phone and asked the Spanish-speaking woman why she had sent the police, and the woman "laughed then asked to speak to the officers." Id.

Petrillo, meanwhile, puts forth a different version of the telephone communications. According to Petrillo, she returned a call from plaintiff intending only to give her the contact information for the local county mental health authority, as Napa State Hospital does not perform voluntary psychiatric assessments. Petrillo Dec. ¶ 3. As she began speaking to plaintiff, Petrillo purportedly became concerned because plaintiff "began making statements concerning her isolation and depression." Id. ¶ 4. Petrillo claims that she carried on the phone conversation with the assistance of a Spanish-speaking hospital staff member, and that during the course of the conversation plaintiff told her that she was depressed, and that she "'want[ed] to hurt herself'" by the

2

use of an automobile to "'drive into or off'" something. Id. ¶ 5. Petrillo was concerned for plaintiff's safety and called the Petaluma Police Department to have them do a "welfare check" on plaintiff. Id. ¶ 5. Petrillo states that her sole reason for contacting the police was her "evaluation and concern that Mrs. Duarte might carry out her threat." Id. ¶ 6. According to the 911 transcript, Petrillo told the following to the 911 operator:

> She's calling saying that she feels like hurting herself. She would drive her car into something or off of something. She is tearful. She has not been sleeping. And she is extremely frustrated that she is on MediCal and Medicare and she is keeps [sic] calling phone numbers for help and because of her medical type of coverage, nobody is helping her.

Id., Exh. A. Plaintiff denies that she ever said to anyone that she wanted to kill herself, or harm herself or anyone else, or use a car to hurt herself. Duarte Dec. ¶ 20.

In any case, it is undisputed that Officers Begrin and Harrison responded to the 911 call and came to plaintiff's apartment. Plaintiff claims that the officers would not speak Spanish to her and could not understand her English. Id. ¶ 11. Begrin allegedly told plaintiff to get her toothbrush because she was leaving with them. Id. ¶ 12. The officers searched plaintiff's purse, apartment, closet and kitchen. Id. Plaintiff tried to explain to the officers that she just wanted to make an appointment with a Spanish-speaking doctor, asked them to leave, insisted that she was fine, and said that she could drive herself to the hospital. Id. ¶¶ 13–14. She also demanded, in Spanish, that they show her a warrant for her arrest. Id. ¶ 14. The officers then allegedly grabbed plaintiff by her arms, took her out of her apartment, put her into a police car and drove her to Sutter Medical Center in Santa Rosa, California. Id. ¶ 16. The officers would not allow plaintiff to take anything with her except a sweater. Id. ¶ 15. Officer Begrin allegedly took plaintiff's purse. Id.

Plaintiff states that she was "scared and crying" when the officers took her to the medical center. Id. ¶ 16. At the medical center, plaintiff was evaluated by Dr. Richard Reisman. FAC, Exh. 1. The Emergency Department Report states that plaintiff was brought to the emergency department "for 5150 Medical Clearance because she supposedly described suicidal intent over the phone when she was calling Napa State Hospital." Id. According to the report, plaintiff told Dr.

3

1  Reisman that her gastroenterologist, Dr. Steady, recommended that she seek counseling for possible
2  psychological issues causing abdominal pain.  Id.  The report states that plaintiff denied any suicidal
3  thoughts but admitted being depressed and living on her own.  Id.

4       Plaintiff was discharged from the medical center and requested that a police unit take her
5  home.  Duarte Dec. ¶ 17.  She was informed that no units were available, so she took a bus and
6  arrived home at 11:30 p.m.  Id. ¶ 18.  Plaintiff claims that this experience has caused ongoing
7  physical and psychological problems, including night sweats, stomach pain and nightmares.  Id. ¶
8  19.

9       Plaintiff filed this action in California Superior Court for the County of Sonoma on April 6,
10 2005, and filed her First Amended Complaint on November 18, 2005.  Defendants removed the
11 action to this court on December 16, 2005.  Plaintiff filed a motion for leave to file a second
12 amended complaint on November 2, 2002.  This court denied plaintiff's motion on December 11,
13 2006.  Defendants now move for summary judgment as to plaintiff's section 1983 claims.

14
15 LEGAL STANDARD
16
17 I.    Summary Judgment

18      Summary judgment is proper when the pleadings, discovery and affidavits show that there is
19 "no genuine issue as to any material fact and that the moving party is entitled to judgment as a
20 matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the
21 case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material
22 fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the
23 nonmoving party.  Id.  The moving party for summary judgment bears the burden of identifying
24 those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine
25 issue of material fact.  See Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  On an issue for
26 which the opposing party will have the burden of proof at trial, the moving party need only point out
27 "that there is an absence of evidence to support the nonmoving party's case."  Id.
28

4

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. Id.; see also Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). Nor is it sufficient for the opposing party simply to raise issues as to the credibility of the moving party's evidence. See National Union Fire Ins. Co. v. Argonaut Ins. Co., 701 F.2d 95, 97 (9th Cir. 1983). If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law." Celotex Corp., 477 U.S. at 323.

On motion for summary judgment, the court does not make credibility determinations, for "the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Liberty Lobby, 477 U.S. at 249. Inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. See Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991).

II.     Qualified Immunity

Qualified immunity shields public officials from liability for civil damages so long as their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The rule of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "Therefore, regardless of whether the constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful." Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir. 1991).

A court considering a claim of qualified immunity must conduct a two-step inquiry. As a threshold question, the court must determine whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). If no constitutional right has been violated, there is no

5

need for further analysis. Id. If a constitutional right has been violated, however, the court must next consider whether this right was clearly established. Id.; Conn v. Gabbert, 526 U.S. 286, 290 (1999).

The plaintiff bears the burden of proving the existence of a "clearly established" right at the time of the allegedly impermissible conduct. LSO, Ltd. v. Stroh, 205 F.3d 1146, 1157 (9th Cir. 2000); Maraziti v. First Interstate Bank, 953 F.2d 520, 523 (9th Cir. 1992). If plaintiff cannot meet this burden, the inquiry ends and defendants are entitled to summary judgment. See Saucier, 533 U.S. at 202; Romero, 931 F.2d at 629 ("If the controlling law is not clearly established, a reasonable person would not be expected to know how to structure his conduct in order to avoid liability") (internal quotation omitted). If plaintiff can show the right was clearly established, the burden shifts to defendants to prove their actions were nonetheless reasonable. See Doe v. Petaluma City Sch. Dist., 54 F.3d 1447, 1450 (9th Cir. 1995); Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995); Shoshone-Bannock Tribes v. Fish & Game Comm'n, 42 F.3d 1278, 1285 (9th Cir. 1994); Maraziti, 953 F.2d at 523. When the "essential facts are undisputed, or if no reasonable juror could find otherwise, then the question [of reasonableness] is appropriately one for the court." See Sinaloa Lake Owners Ass'n v. City of Simi Valley, 70 F.3d 1095, 1100 (9th Cir. 1995).

As qualified immunity provides immunity from suit and is not merely a defense to liability, it is important to "resolv[e] immunity questions at the earliest possible stage in litigation." See Hunter v. Bryant, 502 U.S. 224, 227 (1991). Accordingly, when "the underlying facts are undisputed, a district court must determine the issue on motion for summary judgment." Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993); Saucier, 533 U.S. at 202 (highlighting preference for resolving immunity questions on summary judgment).

III.   Section 5150

California Welfare & Institutions Code section 5150 ("Section 5150") provides:

> When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff . . . of an evaluation facility designated by the

6

> county, . . . or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation.

To constitute probable cause sufficient to justify a warrantless arrest pursuant to Section 5150, the authorized individual must be aware of facts "that would lead a person of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person detained is mentally disordered and is a danger to himself or herself or is gravely disabled." People v. Triplett, 144 Cal. App. 3d 283, 287–88 (1983). The police officer or other authorized party "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant his or her belief or suspicion." Id. "Each case must be decided on the facts and circumstances presented to the [detaining person] at the time of the detention." Heater v. Southwood Psychiatric Ctr., 42 Cal. App. 4th 1068, 1080 (1996) (internal quotation omitted).

DISCUSSION

At the outset it is necessary to properly frame the issues and address certain of plaintiff's general arguments. In the first instance this motion concerns the question of qualified immunity—each of the individual defendants assert that they are immune from plaintiff's Section 1983 claims. Even a constitutional violation is insufficient to defeat qualified immunity so long as "the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful." Romero, 931 at 627. Here, the officers and Petrillo were each acting pursuant to Section 5150, a statute which has been on the books in one form or another in California for nearly forty years. Contrary to plaintiff's assertion, therefore, discussion of Section 5150 does not "exceed[] the scope of the relevant legal issues" for the purposes of this motion. Section 5150 is at the very center of this controversy.

Plaintiff additionally claims that Section 5150 is unconstitutional. Plaintiff's argument is undeveloped and specious—Section 5150 is simply a codification of particular circumstances falling into well-established exceptions to the Fourth Amendment's warrant requirement. See Mincey v.

7

Arizona, 437 U.S. 385, 392 (1978) ("Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."). However, the court need not consider the constitutionality of this section for the purposes of determining qualified immunity. A state official enforcing an unconstitutional statute is nonetheless entitled to qualified immunity so long as the applicable requirements are met. See Pierson v. Ray, 386 U.S. 547, 555 (1967) (holding that a police officer is entitled to qualified immunity when "acting under a statute that he reasonably believed to be valid but that was later held unconstitutional on its face or as applied"). "[W]here a police officer has probable cause to arrest someone under a statute that a reasonable officer could believe is constitutional, the officer will be immune from liability even if the statute is later held to be unconstitutional." Grossman v. City of Portland, 33 F.3d 1200, 1209 (9th Cir. 1994). If the individual defendants acted within the confines of Section 5150, therefore, qualified immunity attaches and summary judgment is warranted.

Additionally, as a procedural matter, this is a motion for summary judgment, not a motion to dismiss for failure to state a claim. Accordingly, plaintiff is incorrect in asserting that the court must accept all of plaintiff's allegations as true, and that the court must assume that Petrillo is lying as long as plaintiff says so. While this court cannot make determinations of credibility, and must draw all inferences in favor of the nonmoving party, summary judgment is a test of evidentiary sufficiency and the court may properly consider Petrillo's sworn declaration in determining whether the "essential facts" are in dispute.[1]

I.   Officers Begrin and Harrison

Plaintiff alleges three constitutional violations on the part of Officers Begrin and Harrison. First, plaintiff challenges her warrantless arrest. Second, plaintiff alleges that the officers improperly searched her home without a warrant. Third, plaintiff claims that the officers used excessive force. The court will consider each alleged violation in turn.

8

#### A. Arrest

A warrantless detention is authorized by Section 5150 upon a showing of probable cause. In order to justify a warrantless arrest under these circumstances, the officer must be aware of specific facts "that would lead a person of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person detained is mentally disordered and is a danger to himself or herself or is gravely disabled." Triplett, 144 Cal. App. 3d at 287–88. Here, Petrillo dialed 911 and informed the operator that plaintiff was in danger of harming herself. Officers Begrin and Harrison received the dispatch, and were given the information that Petrillo had provided to the operator. This, alone, is clearly sufficient to constitute probable cause for the purposes of Section 5150.

Plaintiff objects that the officers relied on "the un-sworn statement of a stranger identifying herself as a nurse and who is relaying incomplete, inaccurate information coming from triple or quadruple hearsay." Opp. at 6. The rules of evidence, however, do not apply in emergency situations. The officers need only point to specific facts giving rise to a reasonable belief or strong suspicion. Requiring the officers to independently verify Petrillo's identity and credentials, and obtain a sworn statement from her, before responding to her emergency call would be manifestly unreasonable.

Additionally, plaintiff faults the officers for not making an independent evaluation of plaintiff's mental state once they arrived at her apartment. Specifically, plaintiff claims that she was calm in her home, that she denied being suicidal, and that the officers did not personally observe anything that would give rise to probable cause. Again, plaintiff mischaracterizes the applicable legal requirements. The officers acted reasonably in relying on Petrillo's emergency call. Section 5150 does not mandate that police officers second-guess the evaluation of a trained healthcare provider by verifying the provider's claims with their own independent assessment. See Peng v. Mei Chin Penghu, 335 F.3d 970, 977–78 (9th Cir. 2003) ("[T]he business of policemen and firemen is to act, not to speculate or meditate on whether the report [of recent crime] is correct.") (internal quotations omitted).

In conclusion, the officers acted fully within the bounds of the law prescribed by Section 5150, and are entitled to qualified immunity for their detention of plaintiff.

B.   Search

Plaintiff claims that the warrantless search of her purse and residence violated her constitutional rights. Having arrived at plaintiff's apartment on a showing of probable cause that plaintiff was suicidal, the officers performed a brief and limited search for weapons in order to protect plaintiff. This search was justified by the perceived exigency of the situation and was therefore reasonable as a matter of law. See United States v. Black, 466 F.3d 1143, 1145 (9th Cir. 2006) (where a warrantless "welfare search" was directed at rescue, rather than a search for evidence of a crime, the court would not "second-guess the officers [sic] objectively reasonable decision" in performing the search).

C.   Excessive Force

In determining whether the application of force in effecting a seizure is excessive, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989). In making this determination, "the 'calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split—second judgments—in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.'" Robinson v. Solano County, 278 F.3d 1007, 1009 (9th Cir. 2002) (quoting Graham, 490 U.S. at 396–97). With respect to qualified immunity in the excessive force context, "the standard of reasonableness for purposes of qualified immunity is distinct from the standard of reasonableness embodied in the Fourth Amendment." Robinson, 278 F.3d at 1012 (9th Cir. 2002) (citing Suacier, 533 U.S. at 206). As with other qualified immunity cases, qualified immunity is vitiated only if the violated constitutional right was clearly established at the time of the violation.

10

Plaintiff's sole allegation of excessive force is that the officers "grabbed [her] by the arms and took [her] out of the apartment." Duarte Dec. ¶ 16. Plaintiff's declaration indicates that this application of force was in response to some degree of resistance by plaintiff—plaintiff demanded, in Spanish, that the officers show her a warrant, asked them to leave, told them that she could drive herself to see the doctor and told them that she did not want to go with them. Id. ¶ 14. In light of the officers' reasonable belief in the urgent need to get plaintiff to a medical facility where she could be evaluated, taking her by the arms into a police car in response to her resistance was not so unreasonable as to defeat qualified immunity, or amount to a constitutional violation.

### D. Conclusion

Having found that plaintiff has failed to defeat Begrin and Harrison's claims of qualified immunity with respect to the arrest and application of force, and that the warrantless search for weapons was reasonable as a matter of law, the court holds that the officers are entitled to summary judgment on plaintiff's Section 1983 claims.

## II. Petrillo

Qualified immunity is available for state hospital officials involved in psychiatric confinement. See O'Connor v. Donaldson, 422 U.S. 563, 576–77 (1975) (holding that qualified immunity was available for a hospital superintendent). Plaintiff asserts that Petrillo's role in summoning the officers to plaintiff's home render her culpable for the ensuing purported violations. As a preliminary matter, plaintiff cites no authority for the proposition that Petrillo should be implicated in the alleged unlawful search and application excessive force. Petrillo was not present when the officers arrived and had no further involvement beyond calling the police. The sole issue, therefore, is whether Petrillo is entitled to qualified immunity based on her decision to initiate a Section 5150 arrest based on her telephone conversation with plaintiff.

The doctrine of qualified immunity allows for mistakes on the part of state officials. "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are

11

entitled to immunity." Hunter v. Bryant, 502 U.S. 224, 228 (1991) (internal quotation omitted). See also Saucier, 533 U.S. at 205 ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct."). Accordingly, so long as Petrillo can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant . . . her belief or suspicion" that plaintiff was in need of immediate medical care, she is entitled to qualified immunity based on her compliance with Section 5150. Triplett, 144 Cal. App. 3d at 287–88.

      Plaintiff denies ever saying that she wanted to kill herself or harm herself using a car, and therefore claims that Petrillo is lying when she claims that plaintiff was in danger. The issue, however, is not that clear. Looking to the full circumstances, the record indicates that Petrillo received information through an interpreter and that Petrillo, based on her training as a healthcare provider, determined that the information gave rise to an emergency situation warranting the intervention of the police. The detailed information that Petrillo provided to the 911 indicates a sufficient factual basis to support Petrillo's suspicion. There is nothing to suggest that Petrillo invented this information out of whole cloth simply to develop a pretext for arresting a woman she had never met. While using a bilingual staff member rather than a trained interpreter was not ideal, Petrillo has demonstrated that she reasonably believed her conduct was lawful. Consistent with the requirements of qualified immunity, the court will not second-guess Petrillo's determination simply because she may have been wrong.

      Accordingly, Petrillo is entitled to qualified immunity as to plaintiff's Section 1983 claims.

III.    City of Petaluma

      A municipality such as the City of Petaluma may be subject to liability under Section 1983 "where 'action pursuant to official municipal policy of some nature cause[s] a constitutional tort.'" Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir. 1992) (quoting Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978)). Because plaintiff has failed to establish that a constitutional tort occurred, there is thus no basis for municipal liability. Nor do Officers Begrin and

12

Harrison claim that they were relying on a particular custom or practice on the part of the city, which would be a further requirement for municipal liability to attach.

Finally, plaintiff alleges inadequate training, which may serve as a type of "policy" giving rise to municipal liability. Long v. County of Los Angeles, 442 F.3d 1178, 1186 (9th Cir. 2006). The only allegations that plaintiff proffers in support of her argument regarding the City's lack of training are the unsupported claims that "their 'training' is to arrest anyone who speaks Spanish and/or whom they have accused of having depression." Opp. at 13. Plaintiff has provided no evidence whatsoever that the defendants in this action were motivated by the fact that plaintiff was Spanish-speaking. Plaintiff has therefore failed to demonstrate municipal liability, and summary judgment in favor of the City is warranted.[2]

## IV. Napa State Hospital

Napa State Hospital is a state institution. Neither a state nor "arms of the state" are "persons" subject to liability under Section 1983. Gilbreath v. Cutter Biological, Inc., 931 F.2d 1320, 1327 (9th Cir. 1991). Napa State Hospital is therefore categorically immune from suit under Section 1983, and summary judgment must be granted in its favor.

## CONCLUSION

For the reasons stated above, the court GRANTS defendants' motions for summary judgment.

IT IS SO ORDERED.

Dated: March 1, 2007

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

13

## **ENDNOTES**

1. The city defendants (Officers Begrin and Harrison and the City of Petaluma) and state defendants (Petrillo and Napa State Hospital) have filed separate motions. Although both motions are couched as motions for summary judgment, the city defendants are willing to accept all of plaintiff's allegations as true, while the state defendants have submitted declarations setting forth additional information regarding the events in question.

2. At oral argument on this motion, plaintiff's counsel suggested that the City's failure to train its police officers to be able to make independent mental health evaluations after responding to a Section 5150 call is constitutionally deficient. This argument is simply absurd. The Constitution does not require municipalities to turn every police officer into a trained mental health professional.